Right. Good afternoon, Council. As you know, we rescheduled this argument because of an illness that Mr. Ibrigno had suffered several months ago. My understanding from the deputy, Mr. Emery, is that somehow this fell through the cracks at your firm? Is that what happened? That's correct, Your Honor. And let me at the outset apologize for my attire. I wasn't aware until Troy called me, I guess, 40 minutes ago. But I felt that I needed to explain to the court what was happening. Mr. Ibrigno had a serious heart attack. Right afterwards, he did apply for an extension of time. It was obtained. And thereafter, he's our appellate guy in our firm. He's the best suited to argue this based on the papers that were submitted to the court. That's where we're at. If need be, if the court would ask that I argue it, I'm prepared to do so. I don't want to waste the court's time to some extent. And I'll make whatever arguments I have familiarity with. I think what we're going to do today, we're going to proceed today. Obviously, this had been adjourned once. And if we got another request, obviously, we would have considered it. But no request was made. My understanding from Mr. White is that they reached out to your firm, I think, yesterday to confirm. So I think we're going to proceed. Obviously, you're free to make any arguments you want to make after you hear from Mr. Enright. We're also prepared to take the case on submission from your end if you would prefer that. But that's up to you. If we have any questions following the argument, we always have the prerogative to let the parties know. But that's how we're going to proceed. Okay. Thank you. All right. All right, Mr. Enright, I see you've reserved one minute for rebuttal, so you can proceed. Thank you, Your Honor. Good afternoon. Thank you for your time in this matter. I'll dive right in. On July 27, 2018, plaintiff filed the first amendment complaint in this the district court entered a scheduling order which directed the plaintiff would have until October 26, 2018 to choose whether or not to amend the complaint. That same day, Network One filed a motion to dismiss. On April 11, 2019, the court denied Network One's motion and any possible notion that plaintiff's claims required amendment were belied by this denial. Thereafter, Network One filed a motion for reconsideration, but because motions for reconsideration are rarely successful, amendment seemed pointless. However, during a pretrial conference on June 21, 2019, and in response to a post-briefing letter that Network One had submitted, including new extraneous assertions of fact gleaned from a newly filed SEC case, which had been filed on June 5, the district court indicated it was inclined to reconsider. In response to the court's indications about its views on reconsideration at the pretrial conference, I explicitly requested leave, quote, to fully replead, I'm sorry, to fully plead, quote, in a fulsome way, an amended complaint to properly frame plaintiff's claims and address the new information and evidence. Specifically, I requested leave to address the new information that was in the SEC complaint and raised by Network One's post-briefing letter in order to cross-reference the SEC complaint and Network One's arguments with other facts and documents which plaintiff had obtained. And to be clear, some of those documents had been available from early in the case, but their import and their implications had not become clear until plaintiff had seen the SEC complaint and Network One's motion for reconsideration and its post-briefing letter in the summer of 2019. Unfortunately, the district court denied plaintiff's oral motion and permitted plaintiff only to renumber certain paragraphs and add only verbatim quotes from the SEC complaint and allowed no further briefing with regard to the motion for reconsideration. On June 28, 2019, plaintiff filed the drastically limited second amended complaint and on July 29, the district court granted Network One's motion for reconsideration, holding that the complaint failed to plead facts giving rise to a strong inference of scienter on Network One's part. However, as I noted earlier, as the case progressed, plaintiff had discovered new evidence substantially bolstering his claims. Some of this evidence was available early on, but as I said, the implications and import of it wasn't clear until that later. Let me just ask you the bottom line decision by the district court ultimately in connection with your rule 60 motion was that it wouldn't affect the outcome. Even looking at the third amended complaint, the additional information that you obviously wanted to add and were not permitted to add wouldn't affect the outcome in terms of correcting the defects with regard to scienter. So can you address that? Yes, your honor. Frankly, your honor, the court's denial of the most relief gave short shrift to the factual analysis and then finding that amendment would have been futile. I think the court clearly misread. There was no single document that would have put them on notice that these were insiders and or that there was no consideration. It seems to me what's being argued. I know obviously you can put more than one document together when you're trying to argue scienter, but there has to be a strong inference. But correctly from home, there's no single document that would have indicated either of those things. It would require putting several documents together, right? No, there's no single document, but there are a series of documents, some of which we had early on, but we didn't realize the import of them until later. Can we be concrete about that? So what is the new evidence? The new evidence is the control log and the bank account statements. Is that right? The most crucial thing that we only received on We got those transfer logs from Continental, which we had not seen previously. And they were in a September 6, 2019 filing by the SEC, which established that there had been no money coming into that escrow account in connection with the December 6. But you don't know whether or not the network one got that particular document, right? There's just some bank statements, but it's not clear which bank statements they got, whether they got that one or not, right? No, I disagree, Your Honor. As part of the third amendment complaint, we allege that that first Continental stock was giving daily updates to network one, number one, and number two, we pled emails in which the folks at Longfin had specifically asked the Continental transfer agent folks to provide that information to network one. So they did get that information. They did get those Continental stock escrow account records, which showed that there had been no money deposited from the December 6 shares, over 400,000 shares for which no consideration was I thought the new record bank records were TV bank records and the key bank escrow accounts. No, no, the new ones were the Continental records, Your Honor. All right. And, and what about the district court's observation that the fact that they were asking for this documentation about payment and also the allegation that was in the second amended complaint that the CEO lied to compelling, at least as equally compelling as any other. What's your response to that? Well, Your Honor, I'm sorry, but, but if, if when we point to documents that were possessed, You don't need to apologize. That was the district court's conclusion. I just want to know what your response is. When, when you have a defendant who received documents, identifying these, the insiders as among these shareholders for the purposes of reaching the 300 shareholder threshold for NASDAQ listing, dozens of them, some of whom Network One was interacting with regularly, including the company's CFO. When you see them listed in as recipients of these unrestricted shares, they, they, and that's a different argument. So then, so then the way that, that Network One would have been on notice is they would have had the list of people who had purchased shares and they should have recognized some of them as insiders. And then you also say that they was this escrow account and you're assuming that Continental or you're alleging, sorry, that Continental was providing updates to Network One. And so Network One should have known that no payments went into the escrow account. Correct. But if in fact, Network One had adopt, had taken at face value, the representation from Longfin that consideration for the shares was transferred into their corporate account, would they have expected money to be transferred into the escrow account? Yes. They, SEC rule 15C2 specifically requires such proceeds to go into an escrow account. And, and the, the underwriting agreement also acknowledged that requirement. And in fact, under, under SEC 15C2. And would it have been, would it have been Network One's responsibility to make sure that it went into the escrow? Like, so let's say that they believed Longfin that money was transferred to the corporate account. Wouldn't that be a violation on the part of Longfin not to put it into escrow? Yes. But again, Your Honor, Network One, if you can't, if, when they're in possession of the documents showing that these things are untrue for them to then prepare this NASDAQ application while possessing the documents showing that that was a lie, concretely. You're, you're, you're assuming they have all the documents together like that. Why isn't it potentially, they don't have any legal obligation to make a certification under the NASDAQ rules. It's the company that makes the certification, not the underwriter, right? Well, it's not that they have a legal obligation under the NASDAQ rules. They have a legal obligation under section 10B, as does any person who, who makes any statement in connection with the purchase or sale of securities. They have an obligation not to make material misrepresentations. But even, even if they receive these documents, why does the receipt without anything more give reference, give rise to a inference of scienter? Because they, because Your Honor, they, under the underwriting agreement, they, they were primarily responsible, explicitly primarily responsible for, for making their, the application to the NASDAQ. And in making that, that application, they had an obligation to, to ensure that it was accurate. Not necessarily under NASDAQ rules, but under section 10B. I don't know where the, what the source of that is. They certainly had a, were entitled to rely on representations from your, from your client, right? They were entitled to rely on what they'd been told that these shares had been paid for. Only to the extent that it, that it wasn't explicitly contradicted by documentation, which they absolutely received. And Your Honor, again, for purposes of this appeal, are we not entitled to assume that your clients lied to them? My clients? You mean a long, thin, long, thin line? I'm sorry, that long, thin line. No, number one, you're supposed to be drawing inferences in my favor. Ms. Danwright, you alleged in paragraph 84 of the second amended complaint that the CEO falsely told them that it had been paid for. So why can't we, I know it was pulled out of third amended complaint, but the district court relied on that allegation. And I don't see any reason why that, that can't continue to be relied upon as, as an allegation. Because even if he, if he made that, that statement to give them cover, they were in possession of hard documentation that, that explicitly contradicted that in terms of the continental stock transfer records. And as a result, those escrow account records, as a result, it really was such hard evidence though that the SEC didn't even name them as a defendant. You're saying you're taking stuff from the SEC complaint and arguing that this is an obvious fraud. And yet the SEC did not even name them as a defendant, right? Your Honor, candidly, I don't want to be smart, you know, a fine institution of our United States government. But as I think the court knows, the SEC is, is overtaxed and they do not tend to, to pursue necessarily the hardest cases in all instances, because they are overtaxed. This is a slam dunk that these documents are so clear. It's possible that they missed it, Your Honor. I don't know what happened at the SEC, but what I can tell you is that the continental stock transfer. I mean, I guess your, your argument might be that the documents are, might turn out not to be clear, but your, your allegations are plausible, at least at this stage. And, and again, Your Honor, all we have to establish at this point, again, with, with all the facts being, being construed in a light most favorable to the plaintiffs. But can I ask, can I ask you this question? I mean, you do have to overcome the hurdle that the, the allegations of CNTR have to be at least as plausible as the, or the inference of CNTR has to be at least as plausible as the inference that they were lied to. And why couldn't, why doesn't this look just like negligence that you're saying, well, they should have seen on the list of people who had purchased the December 6 shares that there were insiders, or they should have paid attention to the, whether there was money going into the escrow account, because that would lead to the conclusion that there wasn't really consideration, even though Longfin claimed there was consideration. I mean, that suggests you're saying really that Network One didn't do its due diligence or could have, should have paid attention to the documents and drawn inferences and not simply relied on But doesn't that just suggest that Network One was negligent? No, Your Honor. And I'll tell you why. Okay. A couple of things. First, if, if possession of hard documents indicating that something is ongoing fraud, that's in the possession of someone doesn't give rise to at least as plausible an inference of CNTR as, as of excusable neglect, then I don't know how anybody ever wins one of these cases, or ever successfully plead CNTR. We've heard that they had the documents that showed dead to rights that, that this was a fraud. That's number one. And again, we don't have to prove that they knew it. The documents themselves aren't dead to rights. The documents have to be combined with some kind of diligence on the part of Network One, right? You have to say, oh, you say that there's consideration, but if there was, it would have had to go into these escrow accounts. And so checking the escrow accounts, it seems like there isn't money there, or they provide you the list of people who purchased shares on December 6th. And then Network One is supposed to say, oh, well, looking at that list, I recognize some of those names as corporate insiders. That's all some, an extra step that happens after they received the documents. The documents on their face don't show fraud, which I mean, maybe they should, maybe they should do that diligence. I'm not exactly dead to rights. Well, your honor, here's the thing. The, the, the document, the particular, particularly the escrow account records clearly show that that there was no money that came in on in connection with the December 6th shares. Even the barest glance at those records would have informed Network One of that fact. That's simple one. Number two, again, this was not a list of thousands of stockholders. It was a, it was a short list of, of 300 shareholders of which 24 of them, at least 24 of them were, were insiders of Longfin, many of whom, again, they, they were directly in touch with and encountering. And so they should have known that any of their shares were, were, were supposed to have been restricted. The other point your short shrift in, in the briefing and certainly from the district court, we alleged that, that Longfin, I'm sorry, Network One negotiated while this was going on an increase in the number of, of the shares, I'm sorry, an increase in the commission and the commission that they would receive from the, the issuance of shares to investors that, that were found by Longfin rather than by Network One. Zero investors were found by Network One. So the, so that was an increase in the commission on the entirety of these shares. That's first. So they negotiated this increase in the commission percentage. Second, they would have gotten no commission on, and should have gotten no commission on those December 6th shares, had they acknowledged that they were not sold for consideration and because the, the proceeds never showed up in the escrow account. So what's the difference there? You're saying that because they negotiated for a higher commissions and they weren't shares that they had sold, it shows that they were soliciting a payoff or something. Is that what you're suggesting? I think that's a fair inference at this stage, your honor. But if they're getting an illicit payoff, would they negotiate for it and it in the contract of commissions? I don't know. It all depends on, on, on what the mechanics are in terms of how money gets transferred out of these accounts. But what I do think it is fair to say is that they had a very substantial financial incentive to look the other way on this because if, if they hadn't done so they wouldn't have gotten that something like $450,000 in commissions from those December 6th shares. Right. And, and for a small, for, let me just. Is there any dispute that when, that when Longfin provided the commissions, they, they were making fraudulent representations that they were sold and therefore there's a certain percentage that's a commission? Your honor, the only, again, under the rules, the only way that, that Network One was supposed to have received a commission was if in connection with this Regulation A offering, shares were sold for, for consideration and, and the proceeds from that sale arrived in the escrow account. That's under the, the underwriting agreement and under SEC Rule 15C2. So, so. I understand. So you're saying that there shouldn't have been commissions, but I'm saying, how do we know that it wasn't Longfin that acted as if they were sold for consideration and then treated them as such and then provided the, the commissions? And that was a misrepresentation on the part of Longfin. Your honor, I don't have to prove my case at the, at this stage. This is, this is at the pleading stage. Why is that? Why isn't that a more plausible inference? I guess we could look the other way, that, that. I have this question, which is we're here on appeal from the denial of your rule 60 motion. Right? So to prevail, you actually have to show that there was new evidence that would have made a difference, even if some of the other allegations might have made a difference, right? Yes. And, and again, your honor, the the key, the key new information. And the key new information you're saying is the escrow information. Yes. Okay. And, and, and the emails that showed that, that, that, that, that network one received the, both the shareholder list and the, the information room continental transfer in terms of the wires. Right. Thank you. Thank you very much, Mr. Enright. Mr. Enright, as I said, you have, you can argue anything you'd I know it's not a great situation, but at this point, thank you, your honors. Um, obviously our arguments are in our appellate brief and we rely on those and we'll submit with respect to our, our brief, except to just make the points that the appellant had multiple opportunities to amend the complaint, chose not to do so against my client. Then the district court correctly decided that there was not newly discovered evidence and it's clear in their decision, uh, how they viewed it. So we believe the arguments are there and the rest of our, but what about, what about the, I mean, do you, it's fine if you're saying, if you say you're not prepared to address it, but what about the, uh, the escrow information that Mr. Yeah, that, that, that argument, your honor, honestly, I'm not prepared to address. All right. Thank you, Mr. Enright. I guess I have, maybe I can have one question, which is, you know, it does seem like in this case, there was an important enough event, which was the filing of the SEC complaint that led the district court to reconsider, um, its prior ruling on the dismiss. Um, if there was such an important development, why wouldn't that have been good cause to allow, uh, to allow the plaintiffs to amend their complaint? Um, your honor, I mean, that was the court's decision. So I can't second guess, um, why that decision was made. However, it was analyzed and it was not deemed by the court to be newly discovered. It was essentially nothing new according to the court. And, um, you know, that's, that's the position we're taking in this case. And the abuse, the discretion of the district court was not abused in our view. Obviously there's an argument on the other side, which has just been articulated. So all right. Thank you, Mr. Emery, Mr. Enright. You have, um, thank you, your honor. One minute. Uh, okay. First, your honor, uh, plaintiff did not have multiple opportunities to replead. Uh, we filed our first amendment complaint. Uh, we asked to, um, for leave to file a second amendment complaint at the pretrial conference that was denied despite the fact, uh, as judgment actually just pointed out, they had just sandbagged us with a whole bunch of new, uh, new stuff from the, uh, this SEC complaint that we didn't have an opportunity, uh, to, to frame and put into, uh, into context that alone, your honor. Uh, I think it was an abuse of discretion given that, that fact that suddenly there was this whole new set of facts we should have been allowed to report. Was it sandbagged? I mean, you knew there was an ongoing SEC investigation, right? I mean, that sort of prompted the lawsuits. Yes. But bear in mind that, uh, the motion for reconsideration had been fully briefed. And then they put in this post briefing letter shortly before the pretrial conference. This was very new. Uh, the, uh, the, the passage of time between the filing of that SEC, uh, complaint and the, um, uh, uh, the, the pretrial conference was, uh, I think two weeks. It was a very short period of time. Second, um, the idea that there's no, but didn't really change the nature of your claims. I guess that's, I mean, why is, does it? So if the district court had set a schedule for setting the complaints, um, why is this a good cause? If it's an investigation that you all knew was ongoing and it was an investigation, the exact same claims, and you were allowed to incorporate material from the SEC complaints. Again, your honor, because there, there was a lot of new stuff in that SEC complaint, which, uh, to their credit network, one's lawyers, uh, leveraged, uh, to their, um, to their benefit, uh, in terms of making arguments for dismissal, uh, we were not allowed to then, uh, uh, to go back and, uh, and frame that based on other documents and other information that would put it into context that would have still shown that there was, uh, that there was a strong inference of Sienta that, uh, that, uh, uh, that network one possessed all this information. We still hadn't gotten the continental transfer records at that point, but, uh, but we'd still had a lot of other information that would have substantially strengthened, uh, our, our, uh, our, our position. So the key information that you're saying would be, is pivotal to your rule 60 motion you didn't have at the time that you were denied leave to, um, uh, to file a second amendment complaints or the full second amendment complaint you wanted to file. Correct. That became available for the first time, just a couple of months later, we did have a whole bunch of other stuff. However, uh, that, that key piece didn't come out until September 6th, but we did have a lot of other, uh, stuff that we could point to in terms of, uh, bank account in terms of the underwriters agreement in terms of, uh, the, the, uh, uh, uh, the litany of stuff, which is laid out in our papers that would have substantially, uh, strengthened our argument that, that, uh, network one had primary responsibility under the underwriting agreement for this. And they had more than enough information at their disposal to, uh, to, to know that this and they had a strong financial, uh, incentive to, uh, to, to look the other way on it. Uh, thank you. Okay. Thank you, Mr. Enright. Thank you, Mr. Emery. We'll reserve decision. Thank you. Have a good day. You too.